# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Fishbowl Solutions, Inc., | Case No.:  0:21-cv-00794 (SRN/BRT) |
| Plaintiff, | |
| vs. | |
| The Hanover Insurance Company, | |
| Defendant. | |

## DEFENDANT THE HANOVER INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**ROBINS KAPLAN LLP**

Scott G. Johnson (#17614X)
Rebecca A. Zadaka (#0401943)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN  55402
Phone: (612) 349-8500
Facsimile: (612) 349-4181
sjohnson@robinskaplan.com
rzadaka@robinskaplan.com

Erica A. Ramsey (Pro Hac Vice)
**ROBINS KAPLAN LLP**
140 North Phillips Avenue
Suite 307
Sioux Falls, SD 57104
Phone: (605) 335-1300
Facsimile: (605) 740-7199
eramsey@robinskaplan.com

*Attorneys for Defendant The Hanover Insurance Company*

**TABLE OF CONTENTS**

PAGE

A.    Introduction ................................................................................. 1

B.    Statement of Facts ...................................................................... 2

　　1.    Fishbowl ......................................................................... 2

　　2.    Fishbowl contracts with Federated Insurance to provide
　　　　consulting services ..................................................... 2

　　3.    The "invoice manipulation" scheme ........................... 3

　　4.    Fishbowl's business operations continue uninterrupted ................... 5

　　5.    The Hanover insurance coverage ................................ 5

　　6.    Fishbowl submits an insurance claim to Hanover. ............. 6

　　7.    Fishbowl commences this action ................................. 6

C.    Argument ...................................................................................... 7

　　1.    Summary judgment is appropriate where, as here, there is no
　　　　genuine issue of material fact, and the moving party is entitled
　　　　to summary judgment as a matter of law. .............................. 7

　　2.    Insurance contracts must be interpreted to give effect to the
　　　　parties' intentions in accordance with the purpose of the
　　　　insurance contract as a whole. ................................................ 8

　　3.    There is no coverage under the Cyber Business Interruption
　　　　provision. ................................................................................ 9

　　　　a.    Business interruption insurance applies when there is
　　　　　　an interruption of normal business operations ........................ 9

　　　　b.    "Business operations" means the income-generating
　　　　　　activities of a business. ................................................ 11

　　　　c.    There was no impairment or interruption of Fishbowl's
　　　　　　income-generating activities. ......................................... 17

　　4.    Fishbowl's proffered interpretation of the Cyber Business
　　　　Interruption improperly gives no meaning to the policy
　　　　deductible provision. ............................................................. 18

　　5.    Fishbowl does not seek recovery of Net Income that would
　　　　have been earned. ................................................................. 20

6. There is specific coverage available for "invoice manipulation" losses but the Hanover Policy did not include this coverage..............................................................21

7. Fishbowl's claimed loss did not result directly from the claimed "data breach." ..........................................................23

D. Conclusion ........................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aucutt v. Six Flags Over Mid-Am., Inc.,*
85 F.3d 1311 (8th Cir. 1996) ........................................................................... 7

*Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey,*
584 N.W.2d 390 (Minn. 1998) ....................................................................... 19

*Carlson v. Allstate Ins. Co.,*
749 N.W.2d 41 (Minn. 2008) ......................................................................... 24

*Chartis Special Ins. Co. v. Restoration Contractors, Inc.,*
No. 10-116060, 2010 WL 3842372 (D. Minn. Sept. 27, 2010) ..................... 7

*Crain v. Bd. of Police Comm'rs,*
920 F.2d 1402 (8th Cir. 1990) ......................................................................... 7

*Emp'r Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.,*
282 Minn. 477, 165 N.W.2d 554 (1969) ........................................................ 8

*Eng's & Constr. Innovations, Inc. v. L.H. Bolduc Co.,*
825 N.W.2d 695 (Minn. 2013) .................................................................. 8, 12

*Erie R. Co. v. Tompkins,*
304 U.S. 64 (1938) ........................................................................................... 8

*Great N. Oil Co. v. St. Paul Fire & Marine Ins. Co.,*
227 N.W.2d 789 (Minn. 1975) ......................................................................... 9

*Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.,*
383 N.W.2d 645 ............................................................................................... 9

*Jenoff, Inc. v. N.H. Ins. Co.,*
558 N.W.2d 260 (Minn. 1997) ......................................................................... 8

*Jetcrete N. Am. LP v. Austin Truck & Equip., Ltd.,*
484 F. Supp. 3d 915 (D. Nev. 2020) ............................................................. 25

*John Deere Ins. Co. v. Shamrock Indus.,*
929 F.2d 413 (8th Cir. 1991) ........................................................................... 7

*JPMorgan Chase Bank, N.A. v. Freybreg,*
    171 F. Supp. 3d 178 (S.D.N.Y. 2016)...................................................................... 26

*Landico, Inc. v. Am. Family Mut. Ins. Co.,*
    559 N.W.2d 438 (Minn. Ct. App. 1997) ............................................................... 19

*Larson v. Nationwide Agribusiness Ins. Co.,*
    739 F.3d 1143 (8th Cir. 2014) .................................................................................. 8

*Metalmasters of Mpls., Inc. v. Liberty Mut. Ins. Co.,*
    461 N.W.2d 496 (Minn. Ct. App. 1990) ......................................................... 9, 20

*Miller v. ACE USA,*
    261 F. Supp. 2d 1130 (D. Minn. 2003) .................................................................... 8

*State Farm Mut. Auto. Ins. Co. v. Tenn. Farmers Mut. Ins. Co.,*
    645 N.W.2d 169 (Minn. Ct. App. 2002) ................................................................. 8

*Triple M Fin., Co. v. Universal Underwriters Ins. Co.,*
    164 Fed. App'x 702 (10th Cir. 2006) ..................................................................... 21

*Trout Brook S. Condo. Ass'n v. Harleysville Worcester Ins. Co.,*
    995 F. Supp. 2d 1035 (D. Minn. 2014) ................................................................. 24

*Union Fire Ins. Co. v. Anderson-Prichard Oil Corp.,*
    141 F.2d 443 (10th Cir. 1944) .................................................................................. 9

*Winthrop & Weinstine, P.A. v. Travelers Cas. & Sur. Co.,*
    993 F. Supp. 1248 (D. Minn. 1998)........................................................................ 12

## Rules

Fed. R. Civ. P. 56(a).................................................................................................... 7

Rule 30(b)(6)................................................................................................................ 20

Rule 56(a) ...................................................................................................................... 7

## A.    Introduction

Business interruption insurance coverage applies where a covered event causes an interruption in the insured's normal business operations. The purpose of business interruption insurance is to protect the insured's prospective earnings that are lost during the time period the business operations are interrupted.

Here, in what is known as an "invoice manipulation" scheme, a bad actor gained access to a Fishbowl employee's e-mail and used it to impersonate Fishbowl, tricking one of Fishbowl's customers into making payments on two invoices to the bad actor. Fishbowl seeks coverage for those two payments under the Cyber Business Interruption coverage of the Hanover policy.

But Fishbowl's claimed loss is not a "business interruption" loss. Fishbowl did not experience an interruption of its normal business operations resulting in a loss of business income, and it does not seek coverage for prospective earnings that it lost during any interruption in its business. Rather, Fishbowl's loss was for monies that it already earned but simply had not yet received because the monies were paid to the bad actor based on fraudulent payment instructions sent by the bad actor to Fishbowl's customer.

Because there is no coverage under the Cyber Business Interruption coverage, summary judgment for Hanover is appropriate.

## B.      Statement of Facts

### 1.      Fishbowl

Fishbowl creates packaged software and develops custom solutions to help companies improve access to information and enable innovation. (Compl., ¶ 9 [Doc. No. 1].) Fishbowl earns its income by billing hours on technical consulting projects with customers, reselling some third-party software, and selling maintenance and technical support contracts. (Decl. of Scott Johnson ("Johnson Decl."), Ex. A ("Timothy Gruidl Deposition") at 12:2-7.)

### 2.      Fishbowl contracts with Federated Insurance to provide consulting services

Fishbowl has over 100 customers. (Gruidl dep. at 36:24 – 37:1.) One of these customers is Federated Insurance Company. (Compl., ¶ 9.)

In July 2019, Fishbowl and Federated entered into a contract under which Fishbowl provided consulting services to Federated. (Gruidl dep. at 18:2 – 19:17; Johnson Decl., Ex. B ("Fishbowl-Federated Contract").) This contract required Federated to remit payments of invoices to Fishbowl at its St. Louis Park offices:

> Payment shall be due within thirty (30) days of the invoice date.
> Client shall send payments to:
>> Accounts Payable
>> Fishbowl Solutions, Inc.
>> 4500 Park Glen Rd., Ste. 200
>> St. Louis Park, MN 55418

(Fishbowl-Federated Contract, at 6; Gruidl dep. at 19:18 – 20:5.)

Fishbowl issued two invoices to Federated for the work that it performed under this contract, Invoice no. 00041737 in the amount of $137,000 and Invoice no. 00041758 in the amount of $39,962. (Gruidl dep. at 20:21 – 24:4; Johnson Decl., Exs. C & D ("Invoice Nos. 00041737 & 00041758").) Like the parties' contract, both invoices directed Federated to remit payment to Fishbowl at its St. Louis Park offices:

> *Please Remit Payment To:*
> **Fishbowl Solutions, Inc.**
> **4500 Park Glen Rd., Suite 200**
> **St. Louis Park, MN 55418**

(Invoice Nos. 00041737 & 00041758, italics and bold in original.)

### 3.   The "invoice manipulation" scheme

This matter arises out of a scheme known as an "invoice manipulation."[1] An invoice manipulation scheme occurs when a bad actor gains access to an insured's employee's e-mail and uses it to impersonate the insured, tricking the insured's client's, customers, or vendors into making payments on invoices to fraudulent accounts.[2]

---

[1] Fishbowl refers to this scheme as a "man-in-the-middle" attack. (Compl., ¶ 1.) But it is more accurately described as "invoice manipulation." *See infra* note 2.

[2] *See generally* Peter Hedberg, *Cyber Coverage Explained: Social Engineering and Cyber Crime Coverage* (Oct. 20, 2020), https://www.corvusinsurance.com/blog/cyber-coverage-explained-social-engineering-and-cyber-crime-coverage (last visited (May 2, 2022); Catherine Lyle, *Are we covered for losses we incur because a client pays a fraudulent invoice?* https://help.coalitioninc.com/en/articles/3315110-are-we-covered-for-losses-we-incur-because-a-client-pays-a-fraudulent-invoice (last visited May 2, 2022).

Here, in November 2019, a bad actor obtained unauthorized access to the e-mail account of Fishbowl's Senior Staff Accountant, Wendy Williams. (Compl., ¶ 10.) Williams's job duties included sending invoices to Fishbowl's customers and communicating with customers regarding invoices and invoicing protocols. (Compl., ¶ 11.)

After obtaining access to Williams's e-mail account, the bad actor established "rules" in Fishbowl's e-mail system that intercepted certain Fishbowl customers' e-mails to Williams. (Compl., ¶ 12.) These rules allowed the bad actor to pose as Williams when communicating with certain of Fishbowl's customers and as one of these customers when communicating with Williams. (Compl., ¶ 16.) The bad actor, masquerading as Williams, requested that these customers change how and when payments were made on Fishbowl invoices. (Compl., ¶ 22.)

Of Fishbowl's more than one hundred customers, only six were targeted by the bad actor in this invoice manipulation scheme. (Gruidl dep. at 36:15-20; Johnson Decl., Ex. E ("Gregery Maschino Deposition") at 116:16-23.) Of those six customers, only two actually issued payments to the bad actor. (Maschino dep. at 117:11-21.) After Fishbowl's discovery of the invoice manipulation scheme, one of those two customers was able to recall its payment. (Maschino dep. at 117:16-21.)

But one customer—Federated—was not. Federated made payments on two invoices (Invoice Nos. 00041737 and 00041758 discussed previously) to the bad actor in the amount of $176,952. (Compl., ¶ 24; Gruidl dep. at 42:12-21.). With assistance from the United States Secret Service, a portion (totaling $29,035.79) of the funds that Federated paid to the bad actor was seized and returned to Federated. (Compl., ¶ 25.) Federated, in turn, sent a check in the amount of $29,035.79 to Fishbowl. (*Id*.) Hence, Fishbowl's claimed loss is $147,926.21 ($176,952 – 29,035.79). (Compl., ¶ 26.)[3]

### 4.     Fishbowl's business operations continue uninterrupted

As noted above, Fishbowl earns its income by billing hours on technical consulting projects with customers, reselling some third-party software, and selling maintenance and technical support contracts. (Gruidl dep. at 12:2-7.) The invoice manipulation scheme did not impair or interrupt these business activities. (Gruidl dep. at 35:23 – 36:2.)

### 5.     The Hanover insurance coverage

Hanover issued a Technology Professional Liability Policy to Fishbowl for the period from July 17, 2019 to July 17, 2020 ("the Hanover Policy"). (Jack Smith Decl., Ex. I ("Hanover Policy").) This Policy included certain first-party

---

[3] Fishbowl still believes that Federated owes this amount to Fishbowl. (Gruidl dep. at 28:10-16.) In fact, long after the "invoice manipulation" scheme, Fishbowl sent a demand letter to Federated for the money. (Maschino dep. at 115:17-25.) Ultimately, however, Fishbowl wrote off the accounts receivable on its books as a bad debt. (Maschino dep. at 114:9 – 115:3.)

coverages under a Data Breach Coverage Form. (Hanover Policy, Data Breach

Coverage Form [HAN0000572].)

The Data Breach Coverage Form included the following Cyber Business

Interruption and Extra Expense ("Cyber Business Interruption") coverage:

> **(5)   Cyber Business Interruption and Extra Expense**
>
> We will pay actual loss of "business income" and additional
> "extra expense" incurred by you during the "period of
> restoration" directly resulting from a "data breach" which is
> first discovered during the "policy period" and which results
> in an actual impairment or denial of service of "business
> operations" during the "policy period".

(Hanover Policy, Data Breach Coverage Form § A.b.(5) [HAN0000573].)

**6.    Fishbowl submits an insurance claim to Hanover.**

On January 23, 2020, Fishbowl notified Hanover of the claimed loss and

sought coverage under the Data Breach Coverage Form. (Compl., ¶¶ 36, 44.) On

November 19, 2020, Hanover denied coverage under the Cyber Business

Interruption coverage. (Johnson Decl., Ex. F ("Nov. 19, 2020 Denial Letter").)

**7.    Fishbowl commences this action.**

On March 24, 2021, Fishbowl commenced this action, asserting claims for

breach of contract and declaratory relief. (Compl., *generally*.) Fishbowl seeks

coverage for the monies that Federated paid to the bad actor under the Cyber

Business Interruption coverage. (Compl., ¶¶ 44, 47, 51, 63. 64, 69.)

But as will be seen, this is a strained effort to put a square peg in a round

hole. Indeed, Fishbowl seeks coverage for an invoice manipulation loss by trying

to characterize it as a "business interruption" loss. This argument fails for a number of reasons as discussed below.

### C.    Argument

**1.    Summary judgment is appropriate where, as here, there is no genuine issue of material fact, and the moving party is entitled to summary judgment as a matter of law.**

Under Rule 56(a), summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). "Insurance coverage cases are 'particularly amenable to summary judgment' because 'the interpretation and construction of insurance policies is a matter of law.'" *Chartis Special Ins. Co. v. Restoration Contractors, Inc.*, No. 10-116060 ADM/FLN, 2010 WL 3842372, at *3 (D. Minn. Sept. 27, 2010) (quoting in part *John Deere Ins. Co. v. Shamrock Indus.*, 929 F.2d 413, 417 (8th Cir. 1991)). Where, as here, the facts are undisputed and "the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-Am., Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (citing *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405–06 (8th Cir. 1990)).

As explained below, there are no genuine issues of material fact, and Hanover is entitled to summary judgment as a matter of law.

2. **Insurance contracts must be interpreted to give effect to the parties' intentions in accordance with the purpose of the insurance contract as a whole.**

The Court's objective when interpreting insurance policies is to "ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract." *Jenoff, Inc. v. N.H. Ins. Co.*, 558 N.W.2d 260, 262 (Minn. 1997). [4] "In construing policy provisions, 'the intent of the parties is to be ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the insurance contract as a whole.'" *Miller v. ACE USA*, 261 F. Supp. 2d 1130, 1135 (D. Minn. 2003) (quoting in part *State Farm Mut. Auto. Ins. Co. v. Tenn. Farmers Mut. Ins. Co.*, 645 N.W.2d 169, 175 (Minn. Ct. App. 2002)).

Accordingly, courts "read the terms of an insurance contract 'in the context of the entire contract,' and do not construe terms so strictly 'as to lead to a harsh and absurd result.'" *Eng's & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704 (Minn. 2013) (quoting in part *Emp'r Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.*, 282 Minn. 477, 479–80, 165 N.W.2d 554, 556 (1969)). This requires that courts "'not construe individual words or phrases in insurance policies in isolation,' but instead 'read the policy as a whole.'" *Larson v.*

---

[4] Minnesota substantive law governs this diversity case. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

*Nationwide Agribusiness Ins. Co.*, 739 F.3d 1143, 1146 (8th Cir. 2014) (applying

Minnesota law and quoting in part *Eng'g & Constr. Innovations,* 825 N.W.2d at

706.) A court "has no right to read an ambiguity into the plain language of an

insurance contract in order to construe it against the insurer." *Henning Nelson*

*Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986.

### 3.   There is no coverage under the Cyber Business Interruption provision.

#### a.   Business interruption insurance applies when there is an interruption of normal business operations.

Business interruption insurance applies where there has been "an

interruption of normal business operations due to damage or destruction of

property from a covered hazard." 11A Steven Plitt, et al., *Couch on Insurance 3d* §

167:9 (2021). Minnesota law is in accord. *E.g.*, *Great N. Oil Co. v. St. Paul Fire &*

*Marine Ins. Co.*, 227 N.W.2d 789, 793 (Minn. 1975) ("By its plain meaning,

'interruption of business' is a breaking or suspension of production earnings of

an operating business. . . .").

The purpose of business interruption insurance "is to protect the

prospective earnings of the insured business only to the extent that they would

have been earned if no interruption occurred, not to exceed the per diem limits of

the policy." *Metalmasters of Mpls., Inc. v. Liberty Mut. Ins. Co.*, 461 N.W.2d 496,

499-500 (Minn. Ct. App. 1990) (quoting *Union Fire Ins. Co. v. Anderson-Prichard Oil*

*Corp.*, 141 F.2d 443, 445 (10th Cir. 1944)); *see generally* 5 Jeffrey E. Thomas, *New*

*Appleman on Insurance Library Edition* § 42.04[1], at 42-115 (2017) ("Generally, the

purpose of business interruption insurance is to protect the loss of prospective

earnings of the insured's business.").

Thus, business interruption coverage applies where a covered event causes

an interruption in the policyholder's normal business operations. If so, business

interruption insurance compensates the insured for the prospective earnings lost

during that interruption. One commentator gave the following example of a

cyber business interruption loss:

> A retailer is attacked by a computer virus and its payment
> processing systems go down. They are offline for 7 days and lose
> $40,000 in gross profit.

Kelly B. Castriotta, *A Semantic Framework for Analyzing "Silent Cyber*," 27 Conn.

Ins. L.J. 474, 508 (2021).

But Fishbowl's claimed loss is not a "business interruption" loss. To be

sure, Fishbowl did not experience an interruption of its normal business

operations resulting in a loss of business income like in the example above.

Furthermore, Fishbowl's claimed loss is not one for prospective earnings that it

lost during any interruption in its business like in the example above. Rather,

Fishbowl's loss was for monies that it already earned but simply had not yet

received because the monies were paid to the bad actor and not Fishbowl.

Fishbowl's loss was caused by an invoice manipulation—payment based on

fraudulent payment instructions sent by the bad actor to Fishbowl's customer –

and not a business interruption.

But because the Hanover Policy does not provide the coverage Fishbowl

seeks, Fishbowl resorts to interpreting words out of context in a strained effort to

fit its invoice manipulation loss into the Policy's business interruption coverage.

Again, this is nothing more than an attempt to fit a square peg into a round hole.

### b.   "Business operations" means the income-generating activities of a business.

The Cyber Business Interruption coverage provision requires, as a

prerequisite to coverage, an actual impairment or denial of service of Fishbowl's

"business operations":

> **(5)   Cyber Business Interruption and Extra Expense**
>
> We will pay actual loss of "business income" and additional "extra expense" incurred by you during the "period of restoration" directly resulting from a "data breach" which is first discovered during the "policy period" and which results in an actual impairment or denial of service of "business operations" during the "policy period".

(Hanover Policy, Data Breach Coverage Form § A.b.(5) at HAN0000573.)

"Business operations" is defined to mean the insured's usual and regular

business activities:

> **SECTION F – DEFINITIONS**
> <div align="center">* * *</div>
> **5.   Business Operations**
>
> "Business Operations" means your usual and regular business activities.

<div align="center">11</div>

(*Id*. § F.5. [HAN0000580].)

As used in the Hanover Policy, the "usual and regular business activities" means the income-generating activities of the business. This interpretation is evident by reading the policy as a whole, as this Court must do. *See Winthrop & Weinstine, P.A. v. Travelers Cas. & Sur. Co.*, 993 F. Supp. 1248, 1254 (D. Minn. 1998) ("The insurance policy must be considered as a whole, according to the language used by the parties to their agreement."); *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 705 (Minn. 2013) ("we read the terms of an insurance contract 'in the context of the entire contract,' . . .").

First, this interpretation is evident by a reading of the Cyber Business Interruption provision itself. Under the Cyber Business Interruption coverage, the "business income" loss must directly result from the actual impairment or denial of service of "business operations," defined to mean the insured's "usual and regular business activities." A loss of "business income" can only occur from the impairment of income-generating activities.

Second, interpreting "usual and regular business activities" to mean the income-generating activities is evident by the "business income" definition. "Business income" is defined to mean:

    a.    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if there had been no impairment or denial of "business operations" due to a covered "data breach" and

      b.     Continuing normal operating expenses incurred, including payroll.

(Hanover Policy, Data Breach Coverage Form § F.4. [HAN0000580].)

So under the policy, "business income" is the net income that would have been "earned" had there been no impairment or denial of "business operations," again defined to mean the insured's "usual and regular business activities." Business income can only be "earned" from income-generating activities. To be sure, "earn" is defined to mean "to receive as equitable return for work done or services rendered." Webster's Third New International Dictionary 714 (1993); see also New Oxford American Dictionary 531 (2d ed. 2005) (defining "earn" as "obtain [money] in return for labor or services."); Bryan Garner, Black's Law Dictionary 547 (8th ed. 2004) (defining "earn" as: "To do something that entitles one to a reward or result, whether it is received or not.").

Additionally, "business income" is defined to include continuing normal operating expenses, including payroll. (Hanover Policy, Data Breach Coverage Form § F.4 [HAN0000580].) It follows that the "business income" definition contemplates that the insured is shut down in whole or in part and cannot earn income. That is the only explanation for why there is also coverage for the insured's "normal operating expenses, including payroll."

Third, interpreting "usual and regular business activities" to mean the policyholder's income-generating activities is also supported by the definition of "Extra Expense." "Extra Expense" is defined to mean:

the reasonable and necessary expenses you incur during the "period of restoration" in an attempt to continue "business operations" that have been interrupted due to a "data breach" and that are over and above the expenses such you would have incurred if no loss had occurred. . . .

(*Id.*, § F.13. [HAN0000581].) Thus, the policy covers those expenses incurred in an attempt to continue "business operations," that is, to continue the business's ability to generate income that has been "interrupted" by a "data breach."

Fourth, that "usual and regular business activities" means the policyholder's income-generating activities is evident by the policy definition of "Period of Restoration." That phrase is defined to mean:

a.   The period of time that begins:

(1)   For "Extra Expenses", immediately after the actual or potential impairment or denial of "business operations" occurs; and

(2)   For the loss of "Business Income", after 24 hours or the number of hours shown as the Cyber Business Interruption Waiting Period Deductible in the **SCHEDULE** on this Coverage Forms, whichever is greater, immediately following the time the actual impairment or denial of "business operations" first occurs. [5]

b.   The "Period of Restoration" ends on the earlier of the following:

(1)   The date "business operations" are restored, with due diligence and dispatch, to the condition that would have existed had there been no impairment or denial; or

---

[5] The Cyber Business Interruption Waiting Period Deductible is 24 hours. (Hanover Policy, Data Breach Coverage Form Schedule [HAN0000572].)

14

>    (2)    Sixty (60) days after the date the actual impairment or
>           denial of "business operations" first occurs; . . .

(*Id*. § F.19. [HAN0000581].)

In short, the Cyber Business Interruption coverage is provided for the "Period of Restoration," defined to mean the time period that starts 24 hours after the impairment of "business operations" and ends when the "business operations" are restored. This contemplates that there is a continuous period of time when the policyholder's income-generating activities have been impaired and, thus, the policyholder is not earning income.

Fifth, interpreting "usual and regular business activities" to mean the policyholder's income-generating activities is also supported by the policy's 24-hour waiting period "deductible" applicable to the Cyber Business Interruption coverage:

> **SECTION D – DEDUCTIBLE**
>                          * * *
> The Data Breach Coverage Deductible does not apply to **SECTION A –COVERAGES**, paragraph **1.b.(6) Cyber Business Interruption and Extra Expense**. Losses payable under Cyber Business Interruption and Extra Expense are subject to the Cyber Business Interruption Waiting Period Deductible shown on the **SCHEDULE** of this Coverage Form.
>                          * * *
>
> **SCHEDULE**
>
>                          * * *
>
> **Cyber Business Interruption Waiting Period Deductible 24 Hours**

(*Id.* § D & Schedule [HAN0000572 & HAN0000576].)[6]

Therefore, a 24-hour "waiting period" applies to any claim for Cyber Business Interruption coverage. A "waiting period" deductible is "[a] deductible provision sometimes used in business interruption (BI) and other time element policies, in lieu of a dollar amount deductible, that establishes that the insurer is not responsible for loss suffered during a specified period (such as 72 hours) immediately following a direct damage loss." *Glossary of Insurance and Risk Management Terms* 320 (13th ed. 2016).

The 24-hour waiting period deductible confirms that that the Hanover policy contemplated an interruption in the insured's income-generating activities. The first 24 hours of the income lost because of the interruption of the insured's income-generating activities is the policy deductible applicable to the Cyber Business Interruption coverage.

In sum, the Cyber Business Interruption coverage provision requires, as a prerequisite to coverage, an actual impairment or denial of service of Fishbowl's "business operations," defined to mean Fishbowl's "usual and regular business activities." As used in the context of policy as a whole, the "usual and regular business activities" means Fishbowl's income-generating activities.

---

[6] A deductible is "[a]n amount the insurer will deduct from the loss before paying up to its policy limit." *Glossary of Insurance and Risk Management Terms* 92 (13th ed. 2016).

Here, and as discussed below, there was no impairment or denial of service of Fishbowl's income-generating activities. Instead, Fishbowl's claimed loss was caused by fraudulent payment instructions sent by a bad actor to a customer and payment of invoices to the bad actor based on those fraudulent payment instructions.

### c.   There was no impairment or interruption of Fishbowl's income-generating activities.

Here, it is undisputed that the invoice manipulation scheme did not impair, interrupt, or prevent Fishbowl from conducting its usual and regular income-generating activities. As noted above, Fishbowl earns its income by billing hours on technical consulting projects with customers, reselling some third-party software, and selling maintenance and technical support contracts. (Gruidl dep. at 12:2-7.) Fishbowl concedes that the invoice manipulation scheme did not impair or interrupt these business activities. (Gruidl dep. at 35:23 – 36:2.) In fact, Fishbowl was able to continue its income-generating activities during the invoice manipulation scheme.

Fishbowl's claimed loss did not result from an inability to conduct its usual and regular business activities. Rather, Fishbowl's claimed loss occurred because Federated, Fishbowl's client, willingly transferred funds due on two invoices to a fraudulent party based on fraudulent instructions purporting to be drafted by a Fishbowl employee. (Gruidl dep. at 88:7-12.) This was a loss caused

by fraudulent payment instruction (*i.e.*, the invoice manipulation) and not an impairment of Fishbowl's usual and regular business activities.

Summary judgment for Hanover is appropriate.

**4.     Fishbowl's proffered interpretation of the Cyber Business Interruption improperly gives no meaning to the policy deductible provision.**

Fishbowl argues that the Cyber Business Interruption coverage applies because the installation of "rules" by the bad actor impaired Fishbowl's business operations in that Fishbowl "was unable to communicate with its clients." (Compl., ¶ 3.) Essentially, Fishbowl contends that impairment of any administrative activity (and not just an income-generating activity) can give rise to a business interruption loss. But Fishbowl's proffered interpretation gives no meaning to the requirement of a policy deductible.

The Hanover policy clearly and unambiguously provides that "[l]osses payable under Cyber Business Interruption and Extra Expense are subject to the Cyber Business Interruption Waiting Period Deductible shown on the SCHEDULE of this Coverage Form." (Hanover Policy, Date Breach Coverage Form, § D [HAN00005760].) As discussed above, the Schedule specifies that a 24-hour "waiting period" deductible applies to the Cyber Business Interruption coverage. (*Id.*, Schedule [HAN0000576].)

But here, Fishbowl does not identify the amount of loss occurring during the first 24 hours of its claimed business interruption because there simply was

18

no business interruption. As discussed above, the invoice manipulation scheme did not impact Fishbowl's ability to provide consulting and other services for its customers. (Gruidl dep. at 35:23 – 36:2.)

Nor does Fishbowl even attempt to explain how the 24-hour waiting period deductible applies to its claim or what the amount of the deductible should be.[7] Essentially Fishbowl gives no meaning whatsoever to the 24-hour waiting period deductible provision. This is contrary to settled principles that a court must read contract terms in the context of the entire contract, interpreting the contract in a way that gives meaning to all its provisions. *See Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998) ("[W]e are to interpret a contract in such a way as to give meaning to all of its provisions."); *Landico, Inc. v. Am. Family Mut. Ins. Co.*, 559 N.W.2d 438, 441 (Minn. Ct. App. 1997) ("A court should not adopt a construction of a policy that neutralizes one provision if an alternative construction exists that gives effect to all the policy provisions and is consistent with the parties' general intent.").

In sum, Fishbowl's interpretation of the Hanover policy cannot be the correct one because it gives no meaning to the policy's 24-hour waiting period deductible provision. Summary judgment for Hanover should be granted.

---

[7] Fishbowl may argue that no deductible applies. But that argument ignores the plain and unambiguous policy language that "[l]osses payable under Cyber Business Interruption and Extra Expense are subject to the Cyber Business Interruption Waiting Period Deductible."

5.   **Fishbowl does not seek recovery of Net Income that would have been earned.**

"Business income" is defined to mean "Net Income (Net Profit or Loss before income taxes) that ***would have been earned*** or incurred if there had been no impairment or denial of 'business operations' due to a covered 'data breach.'") (Hanover Policy at HAN0000580, emphasis added.) Fishbowl does not seek recovery of Net Income that "***would have been earned***"; rather it seeks recovery of money ***already earned***.[8]

Indeed, Fishbowl's Rule 30(b)(6) designee testified that Fishbowl earns its income by billing hours on technical consulting projects with customers, reselling some third-party software, and selling maintenance and technical support contracts. (Gruidl dep. at 12:2-7.) Fishbowl operates under an accrual basis of accounting, so income is "earned" when Fishbowl performs the work and issues an invoice, not when it receives payment on invoices. (Maschino dep. 112:2 – 113:25.)

As a result, Fishbowl's claim is not for net income that "would have been earned"; it was income that had already been earned by Fishbowl. "Earned" is different than "received." The monies that Federated paid to the bad actor were

---

[8] The "would have been earned" language in the "Business Income" definition reinforces the principle that the purpose of the Cyber Business Interruption coverage, like all business interruption coverages, is to protect the ***prospective earnings*** of the insured business. *E.g.*, *Metalmasters*, 461 N.W.2d at 499.

"earned" when Fishbowl performed the work for Federated. What happened here is that the monies were not "received" by Fishbowl.

Summary judgment for Hanover is appropriate.

### 6.      There is specific coverage available for "invoice manipulation" losses but the Hanover Policy did not include this coverage.

In determining whether coverage exists under a particular insurance policy, courts find it "significant" that there is specific coverage available for the claimed loss that was not in the policy and available to the insured. *See*, *e.g.*, *Triple M Fin., Co. v. Universal Underwriters Ins. Co.*, 164 Fed. App'x 702, 704 (10th Cir. 2006) ("Further, it is significant that "[s]pecific coverage for patent infringement is noticeably absent from the policy" and that "there were separate insurance policies available to Triple M that would have provided specific coverage for patent infringement.")

Here, "Invoice Manipulation" coverage is available to respond to the invoice manipulation loss that Fishbowl experienced. *See*, *e.g.*, Dorothea P. Westin, *Invoice Manipulation: The Coverage Insureds Never Knew They Needed*, https://cornerstonesupport.com/invoice-manipulation-coverage-the-coverage-insureds-never-knew-they-needed/ (Dec. 19, 2019) (last visited May 2, 2022); Catherine Lyle, *Are we covered for losses we incur because a client pays a fraudulent invoice?* https://help.coalitioninc.com/en/articles/3315110-are-we-covered-for-

losses-we-incur-because-a-client-pays-a-fraudulent-invoice (last visited May 2,

2022).

One such example provides:

**Invoice Manipulation**

To indemnify the **Insured Organization** for **Direct Net Loss**
resulting directly from the **Insured Organization's** inability to
collect **Payment** for any of the following goods, products or services
after such goods, products or services have been transferred to a
third party, as a result of **Invoice Manipulation** that the **Insured**
first discovers during the **Policy Period**:
      &lt;Precise Description of Goods/Products/Services&gt;

**DEFINITIONS** is amended to include:

\* \* \*

**Invoice Manipulation** means the release or distribution of any
fraudulent invoice or fraudulent payment instruction to a third
party as a direct result of a **Security Breach** or a **Data Breach**.

*See*, *e.g.*, Dorothea P. Westin, *Invoice Manipulation Coverage: The Coverage Insureds*

*Never Knew They Needed*, https://www.csrisks.com/wp-

content/uploads/2019/10/CSRisks-Invoice-Manipulation-V-C2.pdf (Aug. 26,

2019) (last visited May 2, 2022).

The Hanover Policy does not include this Invoice Manipulation coverage.

If Fishbowl had this coverage, it would have been reimbursed for its claimed

loss. But because Fishbowl did not have Invoice Manipulation coverage, it tries

to fit the proverbial square peg into a round hole. Simply put, Fishbowl tries to

shoehorn the same Invoice Manipulation coverage (the square peg) into the

Cyber Business Interruption coverage (the round hole). The Court should reject that attempt. There is coverage available for the square peg; Fishbowl just didn't have it.

In short, there is specific coverage available to cover Fishbowl's claimed invoice manipulation loss. But the Hanover Policy did not include this coverage. What Fishbowl is doing here is attempting to obtain invoice manipulation coverage under another policy provision that does not and was never intended to cover invoice manipulation losses. Summary judgment is appropriate.

### 7.    Fishbowl's claimed loss did not result directly from the claimed "data breach."

Under the Cyber Business Interruption coverage, the loss of "business income" is covered only if it is "directly resulting" from a "data breach" that results in an actual impairment of "business operations." (Hanover Policy, Data Breach Coverage Form § A.b.(5) [HAN0000573].) As explained below, even if there was an actual impairment of Fishbowl's "business operations" and its loss is somehow considered the loss of "business income," Fishbowl cannot satisfy the "directly resulting" causal requirement for Cyber Business Interruption coverage.

Minnesota courts have not construed the phrase "directly resulting" as used in an insurance contract. But the word "directly" is defined to mean "without any intervening agency or instrumentality or determining influence."

23

*Webster's Third New International Dictionary* 641 (1993).[9]  The word "resulting"

means "something that results as a consequence, effect, issue, or conclusion." *Id.*

at 1937. Therefore, Fishbowl's claimed loss (the amount represented by the two

Federated invoices, less amounts recovered) must have been caused by the "data

breach" (*i.e.*, the installation of "rules" in Wendy Williams e-mail account) and

not by some intervening agency or determining influence.

But here, Fishbowl's claimed loss did not directly result from the "data

breach." Rather, Fishbowl's claimed loss was caused by Federated's negligence

and breach of contract.

First, Federated failed to comply with its contractual obligation to remit

payment to Fishbowl's corporate offices and failed to follow the instructions on

the two invoices requiring that payment be sent to Fishbowl's corporate offices.

Second, Federated, unlike another Fishbowl customer, failed to confirm

with Fishbowl the change-in-payment instructions despite red flags.[10] In fact,

Federated received an e-mail with new wiring instructions that was seemingly

---

[9] Because insurance policy language is interpreted according to its plain and
ordinary meaning, "Minnesota courts routinely resort to dictionary definitions to
ascertain the meaning of undefined policy terms." *Trout Brook S. Condo. Ass'n v.
Harleysville Worcester Ins. Co.*, 995 F. Supp. 2d 1035, 1044 n.10 (D. Minn. 2014); *see
also Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45-46 (Minn. 2008) (relying on
dictionaries for meaning of undefined insurance contract terms).

[10] One of Fishbowl's other clients targeted by the bad actor did not pay the bad
actor because it called Fishbowl to validate the change-in-payment instructions.
(Johnson Decl., Ex. H ("Apr. 14, 2020 Gruidl E-mail") at Fishbowl_000374.)

sent from the Fishbowl's correct e-mail address (and contrary to the contractual requirement and invoice instructions to remit payment to Fishbowl's St. Louis Park office). The sudden change to the payment type and the altered e-mail address that one of the e-mails was sent from should have alerted Federated that something might be wrong. Additionally, the first e-mail to Federated from the bad actor contained several grammatical errors, which should have been another warning sign that the e-mail was not genuine. (Johnson Decl., Ex. G ("Dec. 11, 2019 Bad Actor E-mail"), at Fishbowl_000453.)

But Federated, unlike another Fishbowl customer, failed to confirm with Fishbowl any change-in-payment instructions when a simple phone call would have revealed the fraud and avoided the loss. *See Jetcrete N. Am. LP v. Austin Truck & Equip., Ltd.*, 484 F. Supp. 3d 915, 920 (D. Nev. 2020) (holding that customer who paid hacker based on fraudulent wire transfer instructions from hacker of seller's e-mail "was in the best position to prevent the loss by taking the reasonable precaution of verifying the wiring instructions by phone"); *see also JPMorgan Chase Bank, N.A. v. Freybreg*, 171 F. Supp. 3d 178, 186 (S.D.N.Y. 2016) (reasoning that the e-mail scam succeeded because of the defendant's failure to investigate the situation despite numerous red flags).

In sum, Fishbowl's loss was not the direct result of the claimed "data breach." Rather, Federated's breach of contract and negligence in failing to remit payment as required by its contract with Fishbowl and invoices issued to it and

25

in failing to verify the changed payment instructions was an intervening cause.

Accordingly, there is no coverage under the Cyber Business Interruption

provision.

### D.    Conclusion

Based on the foregoing, the Court should grant summary judgment to

Hanover.

June 7, 2022                                 Respectfully submitted,

                                            ROBINS KAPLAN LLP

                                            By: /s/ Scott G. Johnson

                                            Scott G. Johnson (#17614X)
                                            Rebecca A. Zadaka (#0401943)
                                            800 LaSalle Avenue, Suite 2800
                                            Minneapolis, MN  55402
                                            Phone: (612) 349-8500
                                            Facsimile: (612) 349-4181
                                            sjohnson@robinskaplan.com
                                            rzadaka@robinskaplan.com

                                            Erica A. Ramsey (*Pro Hac Vice*)
                                            ROBINS KAPLAN LLP
                                            140 North Phillips Avenue
                                            Suite 307
                                            Sioux Falls, SD 57104
                                            Phone: (605) 335-1300
                                            Facsimile: (605) 740-7199
                                            eramsey@robinskaplan.com

                                            *Attorneys for Defendant*
                                            *The Hanover Insurance Company*